MAIE B. RINDLAUB v. JOHN H. RINDLAUB.

Opinion filed January 29, 1910.

On Rehearing March 8, 1910.

**Appeal and Error — Statement of Case — Settlement after Appeal.**

1. The district judge retains full and complete jurisdiction, after appeal, to settle a statement of case to be used on appeal or to do any other act in furtherance of such appeal. *Held,* accordingly, that plaintiff's motion to strike defendant's statement from the record for reasons assigned as a basis for such motion is without merit.

**Divorce — Grounds — Evidence.**

2. The marriage relation will be dissolved only where its purpose has been defeated by grave and serious misconduct. Such misconduct, to warrant a judgment of divorce, must be established by evidence of a clear and satisfactory character. Public policy, good morals and the interests of society require that the sacred marriage relation should be surrounded with every safeguard, and its severance adjudged only where the complaining party has clearly and satisfactorily brought herself or himself within the terms of the statute.

**Divorce — Extreme Cruelty — Question of Fact.**

3. By section 4049, Rev. Codes 1905, "extreme cruelty" is designated as a ground for granting divorce, and by section 4051 it is de-

fined as "the infliction by one party to the marriage of grievous bodily injury or grievous mental suffering upon the other." Following the construction of this statute, adopted in Mahnken v. Mahnken, 9 N. D. 188, 82 N. W. 870, held, that grievous mental suffering may be sufficient to warrant a divorce under the statute, although not productive of perceptible bodily injury; but whether grievous mental suffering has been inflicted by one party upon the other is purely a question of fact, to be determined in the light of the particular circumstances surrounding each individual case.

**Divorce — Evidence — Clear and Satisfactory Character.**

4. Evidence examined, and held not of that clear and satisfactory character to warrant the granting to plaintiff of a divorce for extreme cruelty.

**Ground for Divorce — Habitual Intemperance — Morphine Habit — Sufficiency of Evidence.**

5. Evidence relating to plaintiff's other alleged ground for a divorce, namely, habitual intemperance in the use of morphine to such a degree as to disqualify defendant, a great portion of the time, from properly attending to business, and which has reasonably inflicted upon plaintiff a course of great mental anguish, examined, and held not established.

**Divorce — Counterclaim — Extreme Cruelty — Insufficiency of Evidence.**

6. Defendant's counterclaim, alleging facts constituting extreme cruelty on plaintiff's part, held, for reasons stated in the opinion, not sufficiently established by the evidence.

**Same.**

7. Defendant's counterclaim for willful desertion by plaintiff held fully established.

Appeal from District Court, Cass County; Templeton, J.

Action for divorce by Maie B. Rindlaub against John H. Rindlaub. From a judgment for plaintiff, both parties appeal. Judgment modified, and lower court directed to enter a judgment in defendant's favor granting him an absolute divorce, assigning to him the homestead during his life, and awarding to him the custody, during a portion of the time, of Bruce and John, two of the minor issue of the marriage.

Barnett & Richardson (Pierce Butler of Counsel), for plaintiff. Ball, Watson, Young & Lawrence, for defendant.

FISK, J. This is an action for divorce, and is here for trial de novo. Plaintiff had judgment in the court below for an absolute divorce and she was awarded the custody, until the further order of the court, of the three minor children, Bruce, born April 18,

1904, John, November 1, 1905, and Newhall April 4, 1907. By the judgment defendant is required to pay to plaintiff within 60 days from the date of the service of the findings, and upon the delivery by plaintiff to defendant of deed of conveyance of the homestead, permanent alimony in the sum of $30,000, and until the further order of the court the sum of $75 per month for the support, maintenance, and education of said children; also certain allowances, as costs and counsel fees in the case. The amended complaint upon which the cause was tried alleges two statutory grounds for divorce; the first being habitual intemperance, and the other, extreme cruelty. The alleged habitual intemperance is specified in the complaint as "the use of morphine and other like narcotic drugs to such a degree that the said habitual intemperance disqualifies said defendant a great portion of the time from properly attending to business, and has inflicted upon this plaintiff a course of great mental anguish." And the alleged extreme cruelty is particularly specified as follows: "That during all the time since plaintiff and defendant were married, defendant has treated plaintiff neglectfully; has shown her little or no kindness or consideration; that defendant has, during all of said time, at times, exhibited a violent temper; has scolded, stormed at, and abused this plaintiff, and has sought excuses and occasions to quarrel with and criticise plaintiff, and has frequently called plaintiff a liar, and has said to plaintiff that she has no pure thoughts. That it was hell to live with her; that she could go. During all the time since the marriage of plaintiff and defendant, defendant has found fault with and scolded and abused plaintiff because his meals did not suit him, and because meals prepared by plaintiff for his guests did not please him. That defendant is, and has been ever since the marriage of plaintiff and defendant, addicted to the use of morphine, and at the times when not stimulated by said drug, and when defendant has suffered for want thereof, he has been particularly cross, abusive, and fault-finding with this plaintiff. That plaintiff first learned that defendant used morphine a few days after her marriage, and when they were on their wedding trip, when plaintiff saw defendant take a hypodermic injection on the train. That plaintiff did not then understand what this meant, and prior to her marriage had no knowledge or information that the defendant was addicted to the use of morphine. That at times when plaintiff undertook to defend herself against the abuse of said defendant, or

make answer to his accusations and fault-finding, defendant has told this plaintiff that she could go, and has said to this plaintiff that he wanted nothing to do with her; that they would live in the same house, but that all he wanted of her was mere civility. That during the times when plaintiff has been pregnant and large with child defendant has been particularly abusive to plaintiff, taunting her with her condition and appearance. That after plaintiff and defendant were married, defendant took plaintiff on a wedding trip to countries contiguous to the Mediterranean Sea, including Palestine and Egypt, and from thence to Naples, Italy and, north across Europe. That during said trip the plaintiff became ill with la grippe, and afterwards when they arrived at Luxor in Egypt the plaintiff again became very ill, and was prostrated with pneumonia; that while in this condition they returned to Cairo, where the plaintiff was confined to her bed with pneumonia. While the plaintiff was still ill, and not wholly recovered from said attack of pneumonia, and was weak from the effects thereof, all of which the defendant well knew, the defendant compelled the plaintiff to continue their journey north. At no time after leaving Cairo did defendant give this plaintiff any medical care or show her any consideration, but on the contrary, during said journey north and through Europe, the defendant insisted and compelled this plaintiff to sight-see and to travel continually and without sufficient rest or nourishment, medical care or attention, and also insisted upon and compelled plaintiff to carry her luggage, and refused to employ, or permit her to employ, porters for such purpose. That during such time and times this plaintiff was sick and very weak, which fact was known to the defendant. That in the month of December, 1903, plaintiff was big with child and doing her own housework, including keeping up of fires, carrying coal, and doing all the drudgery. That defendant scolded and abused plaintiff, and complained of what she did and was able to do in keeping house, and found fault with plaintiff for being ill until plaintiff became prostrated, all of which defendant well knew. That defendant, although a physician himself, gave plaintiff no treatment whatever, and employed no physician until plaintiff became so ill that she was confined to her bed, when a physician was called. That at this time, and when plaintiff was confined to her bed, defendant came to her bedside and abused her, and told plaintiff that she was crazy, and that it was impossible to live with her. That on or about the night

of April 15th, shortly before her child was born, plaintiff was suffering pains, and, believing she was about to be confined, waked defendant and told him about her pain, whereupon defendant swore at plaintiff for disturbing him, and afterwards, when plaintiff said that she could not stand being sworn at, defendant said that if she could not stand it she could go. That during the month of August, 1905, when plaintiff was pregnant with her second child, and had so been pregnant for about six months, the defendant abused plaintiff until plaintiff fell upon the floor from the excitement and exhaustion occasioned by the defendant's said abuse, that defendant then called plaintiff a d——d fool, and stepped over the body of the plaintiff, and left her upon the floor of the room, by reason of which said abuse and bad treatment of plaintiff by the defendant plaintiff was made sick and ill and confined to her bed. That soon after the defendant again abused plaintiff, called her a d——d liar and 'truthful James,' and applying to plaintiff other epithets and names. Upon another occasion, when plaintiff was carrying her third child, defendant abused her until plaintiff left the room in which defendant was so abusing her, and he followed her to another room, continuing his abuse."

The answer puts in issue by specific denials the various allegations of the complaint under both alleged causes of action, and as to the charge of habitual intemperance he alleges that for many years "last past he has been afflicted with a physicial malady, which at irregular times, sometimes a few days apart, and sometimes several weeks apart, prostrates him, and that when thus prostrated he suffers excruciating and unendurable physical pain; that upon such occasions, and no others, defendant has been for many years accustomed to take small injections of a special preparation of morphine, the same being thus taken for the purpose of the recognized valuable therapeutic action of the drug upon the system, as well as the alleviation of such pains, and rendering it possible for defendant to endure the same; that defendant has never become addicted to the use of morphine or any like drug, and his use of the same was for the purposes aforesaid, and at the times aforesaid, and that the taking of the same under such conditions, and the amount taken, have been recommended and approved by the best medical advisers with whom defendant consulted." He denies "that he has ever become habituated to the use of morphine or other like drug, and denies that he ever used the same to any excess; de-

nies that the taking of the same has ever disqualified him for a great portion of the time, or for any portion of the time, from properly attending to his business and denies that the same has inflicted upon the plaintiff a course of great mental anguish or any mental anguish whatever. Defendant further alleges that plaintiff well knew at and prior to the time of their marriage that defendant was afflicted with a serious physical malady and well knew at the times of his prostration that he suffered great and unendurable pain as a result of such malady. Defendant denies that he has ever been addicted to the use of morphine except as hereinbefore stated and denies that either through the use of morphine or any other narcotic, under the circumstances stated, or otherwise, or the abstention from such use, defendant was made either cross, abusive, or fault-finding with the plaintiff." He admits "that he is by education and profession a specialist in the treatment of disease of the eye, ear, nose, and throat," and alleges "that in the practice of said profession he has at all times since his marriage with the plaintiff been required from time to time, to perform delicate surgical operations upon patients under his professional care; that except when prostrated by the acute attacks of his said physical malady, he has been accustomed, during all such period, to perform such delicate surgical operations." Defendant further alleges "that he has never made any secret of his use of morphine or other drug as a means of alleviating his physical suffering at the time of such prostrations." With reference to the various allegations contained in plaintiff's second cause of action relating to alleged acts of cruelty, defendant specifically denies the same.

Paragraphs 4, 5, 6, 7, 8, and 9 of the answer are as follows:

"(4) Further answering the complaint defendant denies that plaintiff, during her married life, has conducted herself towards this defendant as a dutiful wife, and on the contrary alleges that plaintiff for more than a year last past has been quarrelsome and fault-finding, has frequently shown little or no sympathy with defendant at the times when he has been prostrated with his physical malady, and that her conduct generally has lacked in sympathetic care and devotion to him. Defendant admits that for more than a year last past there have existed matters of dispute and misunderstanding between himself and the plaintiff, admits that they have occasionally quarreled, and admits that unkind words have been spoken by each of them; but defendant further alleges that in so far as such mis-

understandings, disputes, and quarrels having occurred, or unkind words have been spoken, the same have been caused as hereinafter fully set forth; denies that the same inflicted upon plaintiff grievous mental or bodily suffering.

"(5) Further answering the complaint, defendent alleges that such bickerings, misunderstandings and quarrels as have existed in the marital relations between the parties hereto have been very largely, if not wholly, produced and caused by unjust, unwarranted, and inexcusable interference and trouble-making on the part of the father and mother of the plaintiff herein. That her said family reside in Fargo, and have so resided for many years last past. That they and each of them have continually, for more than a year past poisoned the mind of the plaintiff against this defendant, and have interfered in the private family affairs of the defendant, and have misrepresented and maligned his actions and his motives, have manufactured and put in circulation the grossest and most inexcusable slanders and misrepresentations concerning him, and have instilled in the mind of the plaintiff a feeling of bitter hostility towards him because of certain alleged, but baseless and wholly imaginary, wrongs done her by the defendant. That plaintiff has at all times been greatly under the influence of her father and mother; has listened to and followed their plans and designs has given ready credence to their false and unwarranted slanders against defendant, and that in this way the happiness of the domestic life of the plaintiff and defendant was greatly impaired and interfered with. That the father and mother of plaintiff, very soon after defendant's marriage, conceived a bitter dislike to him, and since such time have systematically, and in all manner of ways, sought to instill into plaintiff's mind a feeling of dislike and hatred for defendant. That in so doing the family of plaintiff have resorted to the bitterest malice, and the most unjust and cruel falsehoods, even to the point of recklessly, maliciously, and falsely charging defendant with infidelity to his marriage vow, and instilling in plaintiff's mind a belief in such infidelity. That as a result of such malicious, cruel, and unwarranted interference in the family affairs of the parties hereto, the mind of the plaintiff became and is poisoned against defendant, and she has been ready to believe the falsehoods and slanders thus circulated by her parents, and has herself charged this defendant with infidelity, and has stated to others that he was untrue and unfaithful to her.

"(6) Further answering the complaint, defendent alleges that he has frequently begged plaintiff to free herself from the influences exercised upon her by her parents, and has frequently said to her they would live a happy and contented married life if they were free from the interference of her family. That prior to plaintiff's abandoment of defendant, defendant on several occasions, for the sake of preserving their marital peace and happiness, offered to plaintiff to remove permanently from Fargo, to give up his professional practice in said city, and to remove to some other place where they would be free from the interference of plaintiff's family, which offer plaintiff never accepted or agreed to.

"(7) Defendant further alleges that ever since his marriage with plaintiff he has furnished her with a home which was supplied with the appointments of comfort and luxury. That he provided her with ample help for the domestic work, and with nurses at the time of her own illness and the illness of their children. That he supplied her with horses and carriages for her use in driving. That he provided her with money in a bank account standing in her own name, and replenished the same from time to time so that she could draw thereon as she desired, and otherwise gave her whatever was necessary for the reasonable gratification of her tastes and desires. That in the months of August and September, 1906, plaintiff took a trip to Alaska in company with her father, the defendant paying all her expenses incurred in connection therewith, and defendant charges that, while upon such trip, plaintiff being absent from Fargo more than eight weeks in making the same, the plaintiff and her father conspired to break up defendant's home, and as far as lay in their power to wreck his .lomestic happiness, and to impair and destroy his professiona. standing. After returning from such trip plaintiff came back to their home, resumed the care of the house and the performance of her duties as housekeeper, and seemed glad to return. That on the 22d day of November, 1906, the plaintiff, without giving the defendant the slightest warning of her intention to do so, but as defendant is advised, and as he verily believes the fact to be, in pursuance of a pre-arranged plan between herself and her parents, in the forenoon of said day, after defendant had left their home and gone down to his place of business, forsook and left the home of defendant in company with her father, taking with her the two children, one of whom was dangerously ill, and also tak-

ing most of her personal belongings, and a large number of the private papers and effects of defendant, and that without the slightest warning of such an intention on her part, and to the consternation and great surprise of this defendant, the plaintiff began this suit. That the plaintiff went to the home of her parents, and has remained there ever since the commencement of this suit, and that, although he has repeatedly sought to see her and obtain an explanation of her conduct, he has been refused by her parents the privilege of so much as seeing or speaking to his wife, and that his wife is now so completely under the influence, control and dominion of her parents that it is impossible for defendant to so much as see her, or to talk over with her their differences in the past, in all of which matters the plaintiff's parents have acted with vindictive and cruel maliciousness, and with the intent to so poison the mind of plaintiff that she would be unwilling to return to her duties as the defendant's wife.

"(8)   Further answering the complaint, defendant alleges that since plaintiff's departure from his home in Fargo, as aforesaid, he has continued to keep, and is now keeping, said home open, cared for by servants, and, notwithstanding the premises, plaintiff has never returned, or offered to return, to her home, and has refused to even see defendant since her said abandonment of him.

"(9)   Further answering the complaint, defendant alleges that shortly prior to their marriage he presented to plaintiff a deed of conveyance to the south 95 feet of lots 11 and 12, block 33, of the original plat of Fargo, upon which to erect their home; that thereafter defendant erected a dwelling thereon, the total value of such lots and dwelling being about $25,000; that such premises have at all times since been the homestead of the parties hereto, and the same are now occupied as such by the defendant. Defendant admits that he has had a large practice in his professional work, but denies that his income has been anything like the amount stated in the complaint, and denies that he has accumulated a fortune in the sum of from $300,000 to $500,000, or in any like amount. Defendant alleges that his income and the amount of his present worth are greatly exaggerated in the complaint; that while he has in fact enjoyed a large professional practice, a considerable proportion of the work done has been charitable in its nature, and that a considerable proportion of the total charges made for professional work have been uncollectible; that exclud-

ing the homestead in Fargo, the furniture and furnishing thereof, the barn and ground upon which it stands, and the horses and carriages therein, defendant at the present time is worth not to exceed $100,000, and that in his opinion the value of such property does not in fact exceed the sum of $75,000."

Such answer also contains two counterclaims; the first charging plaintiff with extreme cruelty, and the second charging her with desertion on November 22, 1906. The first counterclaim, among other things, specifically alleges the following acts of plaintiff constituting the alleged extreme cruelty, to-wit: "That without cause, excuse or provocation, she has charged defendant with infidelity to his marriage vow. That she has charged him with being untrue and unfaithful to her since their marriage. That she has charged defendant with criminal intimacy with other women. That plaintiff also grossly slandered and abused defendant by stating to others that defendant has been guilty of infidelity to his marriage vow, that he had been criminally intimate with other women since his marriage to plaintiff, and that he had been untrue and unfaithful to her. That each and every of said charges and slanders were untrue, and were without foundation in fact. That defendant never gave plaintiff any cause, excuse, or provocation whatsoever for the making of said charges, or the circulation of such slanders, but that in all respects, since their marriage, he at all times conducted himself as a true and dutiful husband should do. That plaintiff has likewise charged defendant with being a morphine fiend, and with being addicted to the excessive use of morphine and other like narcotics; that she has uttered and put forth slanderous and untrue statements to the effect that he was a morphine fiend, and addicted to the excessive use of morphine and other narcotics, and all with the purpose of injuring and wounding his feelings, to impair and if possible destroy his professional standing and reputation as a physician and specialist in the practice of the medical profession in Fargo. That the making of such charges and slanders was without excuse or provocation, and that the same were utterly and wholly false and untrue. That by reason of the making of such charges, and the putting in circulation of such slanders, plaintiff has inflicted upon defendant great and grievous bodily and mental suffering. That on or about November 22, 1906, without the slightest previous warning of her intention so to do, plaintiff gathered up her per-

sonal belongings and departed from defendant's home, going to the home of her parents in this city. That she took with her also the two children, Bruce and John; the latter at the time being seriously ill. That by so doing she exposed the life of the said child, John, to very serious danger. That plaintiff's leaving her home under such circumstances, and taking the children in the manner as aforesaid, was immediately followed by the service of summons and complaint herein. That all of said acts upon the part of plaintiff were wholly without cause, excuse or provocation, and were planned and designed with the effect, and that they did have the effect, of inflicting great and grievous mental and bodily suffering upon defendant. That said actions of the plaintiff created gossip, and gave rise to the circulation of scandals, all without any excuse or provocation whatever upon the part of this defendant, and all of which caused him great and grievous bodily and mental suffering and anguish. That by reason of all of the facts hereinbefore stated plaintiff has inflicted upon this defendant great and grievous mental and bodily suffering, and has destroyed his peace of mind, and has rendered it impossible for him ever again to live with the plaintiff as her husband."

The prayer of the answer is: "(1)  That the complaint of the plaintiff herein be dismissed.  (2)  That a final decree be made herein, granting unto defendant an absolute divorce from the plaintiff.  (3)  That the custody of the minor children, Bruce and John, be awarded to this defendant.  (4)  For such other and further relief as to the court may seem meet and proper."  To such counterclaim a reply was served, admitting: "That she has stated in her complaint in this action that the defendant has been guilty of habitual intemperance in the use of morphine and other narcotic drugs, and is and has been addicted to the use of morphine as in said complaint alleged; reference thereto being had."  And also: "That on or about the 22d day of November, A. D. 1906, she left her home, taking with her her two children, Bruce and John, and that she upon the same date commenced this action by the service upon the defendant of the summons and complaint"—but specifically denying the other allegations, both as to extreme cruelty and desertion.

We have thus fully set forth the various contentions of these parties as disclosed in their pleadings, as we deem it necessary to a clear understanding and a proper disposition of the case.

The learned trial court found against plaintiff on her first cause of action, and against defendant on both counterclaims, deciding in plaintiff's favor on her second cause of action, namely, extreme cruelty. In view of the fact that the action is here for trial de novo, we deem it unnecessary to review the findings of fact and conclusions of law in this opinion. Such findings and conclusions cover 46 pages of the printed abstract, going into the minutest details of evidentiary matters, whereas if they had been properly restricted to ultimate facts and conclusions, much less space would have sufficed. Such practice is not to be commended, and should be discontinued. Counsel, no doubt, are largely to blame by proposing findings in this form. Both parties have appealed, and ask a review and retrial of those issues only which were decided adversely to their respective contentions. Defendant's printed abstract contains 2,301 pages, and plaintiff's abstract 3,250, a total of 5,551 pages. There are eight printed briefs, so-called, four on each side; the number of pages in plaintiff's briefs being 838 and in defendant's briefs 421. Plaintiff's abstract duplicates everything in defendant's abstract, as we understand it, with other matters not material to defendant's appeal. This was wholly unnecessary and a useless expense. We have, at the expense of other equally important business before this court, and with much care and patience, read this great mass of printed matter, and we are convinced that much of this work was wholly unnecessary. The issues are simple, and there is no reason for such a protracted trial. Much of the testimony is repeated, and much more wholly irrelevant and immaterial. One-fourth of the time consumed was, we think, amply sufficient. We refer to these matters at this time because this case presents in so marked a degree the flagrant abuses so frequently indulged of the privileges given litigants by the so-called Newman law, which law requires that all evidence offered on the trial of certain cases must be received. Such abuses, if persisted in, should, and no doubt will, result in the repeal of such law, or an amendment thereof; that being the only remedy.

We will first consider the questions presented on defendant's appeal. Certain questions are raised and presented by separate briefs upon the judgment roll proper. These need not be considered, in view of the conclusions reached on the other features of the appeals. Nor, for like reasons, need we notice plaintiff's preliminary motion to strike from the record certain uncertified docu-

ments and papers enumerated in detail in her brief on the judgment roll proper. At the outset we are confronted with a motion by plaintiff's counsel to strike from the record the entire statement of case on defendant's appeal. The grounds of the motion are epitomized by counsel as follows: "First. By causing the judgment roll proper to be filed in the Supreme Court on August 20, 1908, without the settlement of the statement of the case, and causing the case to be placed on the calendar in said court, the defendant had abandoned all idea of settling his statement of the case, and had elected to try his case on the judgment roll proper. Second. That as no showing of good cause or reason was made to the Supreme Court on the application to remand the record why the defendant had the right to change his mind and again elect to try the cause on the evidence. The Supreme Court without such showing or without notice ought not to have remanded the record. Third. That as statutory time had long past within which to settle the defendant's proposed statement of the case, and as the defendant had not made any showing of 'good cause or in furtherance of justice,' the Supreme Court was without jurisdiction to remand the record for the purpose of having the defendant's proposed statement of the case settled, or to direct the district court to settle the same, and that the Supreme Court could no more gain jurisdiction for this purpose without such showing than the district court could have done." Such motion is wholly devoid of merit. It is not contended, nor could it be successfully contended, in the face of the record, that ample cause for an extension of time was not shown to the trial judge. In the light of the affidavit of Judge Young, which was presented and brought into the record and considered by the trial judge, no doubt exists in our minds of the jurisdiction to settle such statement. The case of McDonald v. Beatty, 9 N. D. 293, 83 N. W. 224, cited by respondent, is not in point.

The argument that causing the judgment roll proper to be filed in this court before the settlement of such statement evinces an election by defendant to submit his appeal on such judgment roll alone, is, in view of the record, manifestly erroneous, as is also the argument that this court could not, in the absence of good cause shown, remand the record to the lower court, as was done. The latter contention is sufficiently answered by saying that it was wholly unnecessary that such record should have been remanded. The trial judge was clearly in error in exacting this as a condition

to his proceeding to settle such statement. The trial court, after an appeal, retains jurisdiction to perform any act in furtherance of the appeal. Flynn v. Cottle, 47 Cal. 527; Colbert v. Rankin, 72 Cal. 197, 13 Pac. 491; State v. Board, 69 Wis. 264, 34 N. W. 123; Hunnicutt v. Peyton, 102 U. S. 354, 26 L. Ed. 113; 2 Cyc. 966, and cases cited; Tiffany v. Henderson, 57 Iowa, 490, 10 N. W. 884; Goff v. Hawkeye, etc., 62 Iowa, 691, 18 N. W. 307; James v. Lepert (Nev.) 2 Pac. 753; Mercantile Co. v. Fussy, 13 Mont. 401, 34 Pac. 189; McAllep v. The Latona, 3 Wash. T. 332, 19 Pac. 131; Coulter v. G. N. Ry. Co., 5 N. D. 568, 67 N. W. 1046. The case of Moore v. Booker, 4 N. D. 543, 62 N. W. 607, is not in point. That was a case where the trial court, after an appeal had been perfected, and the case argued and submitted in the Supreme Court, undertook to alter the record without first causing such record to be remanded for that purpose.

This brings us to the merits on defendant's appeal, in the consideration of which the question presented will be classified into two general branches: First, those relating to the correctness of the lower court's findings and conclusions as to the plaintiff's second cause of action, namely, extreme cruelty; and second, those findings and conclusions relating to defendant's counterclaims alleging extreme cruelty and willful desertion on plaintiff's part. In the retrial of these issues we are to be governed by certain general, but well-settled principles of law. The party having the burden of proof upon any issue must establish the truth of the fact or facts alleged by clear and satisfactory evidence. Before a court will be justified in dissolving the sacred marriage relation, and thus visiting upon the innocent offspring the undeserved punishment of being deprived of the happiness and comfort of the home life, the party seeking to sever such relation should bring himself or herself clearly within the provisions of the statute. As well stated by Mr. Nelson, author of the article on Divorce in 9 Am. & Eng. Enc. Law, 728: "The state permits the dissolution of marriage only where the purpose of the relation has been defeated by grave and serious misconduct. Such misconduct must, on an application for divorce, be established by competent evidence of a full and satisfactory character." Another text-writer expresses the same general principle as follows: * * * Public policy, good morals and the interests of society require that the marriage relation should be surrounded with every safeguard and its sever-

ance allowed only in the manner prescribed and for the causes spec-
ified by law." 14 Cyc. 578. This court, in passing upon the ques-
tion of the sufficiency of evidence to sustain a charge of extreme
cruelty alleged by the wife against the husband as a ground for
divorce, took occasion, through Bartholomew, C. J., to say: "Again
in 1898, and following close upon one of those episodes which
it is alleged produced, not only mental suffering, but bodily injury,
we find plaintiff in St. Paul on means furnished by her husband,
and writing him letters which might stand as models for happy,
light-hearted and affectionate wives to send to absent husbands.
We find no evidence in this case of the infliction of that grievous
mental suffering that the law requires to justify the granting of
a divorce. No doubt the language used by defendant would pro-
duce anger in a proud-spirited woman. But it is not for that cause
that the marriage contract can be annulled. That contract,
while it imposes upon the parties thereto the imperative obliga-
tion never to unnecessarily anger or wound each other, yet it also
imposes the duty of forgiveness of all those weaknesses, imper-
fections and peculiarities to which humanity is ever prone. The
sacred observance of that contract is demanded by many public in-
terests. It is demanded by the interests of the immediate parties
thereto, and, more than all, it is demanded for the proper nurture,
protection, and training of the offspring that results from the mar-
riage contract. The statutory grounds for divorce in this state
are broad, and courts may not multiply divorces by granting them
in cases not clearly within the statute." Mahnken v. Mahnken, 9
N. D. 188, 82 N. W. 870.

In the light of these general principles we proceed to a consid-
eration of the evidence relating to plaintiff's allegations of extreme
cruelty, upon which the judgment appealed from was rendered.
In view of the great mass of testimony it is, of course, entirely
out of the question for us to review the same at length in this opin-
ion. We can only, in the most general and cursory manner, refer
to it. Nor would it serve any useful purpose to do more, as each
case necessarily stands upon its own peculiar facts.

The parties were married at Fargo on January 31, 1903, and
lived together until November 22, 1906—3 years and 10 months—
and, as a result of such marriage, three boys have been born, as
heretofore stated, all of whom are now in the custody of the plain-
tiff. At the time of the commencement of the action, November 22,

1906, plaintiff was 28 and defendant 42 years of age. Plaintiff is the only child of Wm. B. Dougless and wife, and she was reared in the city of Fargo, where her parents have resided for many years. Defendant, a native of Wisconsin, of German parentage, is a specialist of the diseases of the eye, ear, nose and throat, and upon completing his medical education he located in said city in 1896 for the practice of his chosen profession, and he has been very successful, having attained eminence in his line. It is here that he met, wooed, and won the plaintiff. Immediately after the wedding, January 31, 1903, they embarked on a wedding tour to the old world, where they visited Egypt, Italy, the Holy Land, France, Germany and other countries, being absent for several months. Just prior to the marriage defendant caused to be conveyed to plaintiff certain real property in Fargo, and soon after such marriage defendant erected thereon a dwelling at a cost of nearly $25,000, and furnished the same in a comfortable and luxurious manner in which the parties made their home until the day the action was commenced, and where the defendant has ever since resided. During all the time they lived together plaintiff was furnished a separate bank account, which was kept replenished by defendant at all times, against which she was enabled to check at pleasure. She was also provided during most of the time, and at all times when possible to hire them, with servants, nurses and medical attendants. What are the acts of cruelty relied upon by respondent to sustain the judgment? And what is the proof as disclosed by the record?

It is asserted that defendant commenced his course of abuse and ill treatment of plaintiff immediately after the marriage, and while they were on their wedding tour. In addition to the many accusations made in the complaint the plaintiff narrates in her testimony a great many more, to the most important of which we will refer. She would have the court believe that immediately after the marriage a radical change came over defendant; that instead of a tender, loving and affectionate husband he almost instantly commenced towards her a course of gross abuse and ill treatment, without any apparent motive, and which abuse and ill treatment continued almost continuously throughout the period that they cohabited together. She even charges him with meanness, stinginess, and a lack of due consideration for her comfort and happiness, antedating the marriage, in providing an undesirable, poorly ventilated,

second or third class stateroom on the steamer, the Kaiserin Maria
Theresa, on which they took passage on their wedding tour.  Such
compartments were engaged through correspondence, and un-
doubtedly were thus engaged long prior to the wedding day, as they
departed on their long journey on the evening of the wedding.
Plaintiff swears that while at the hotel in New York, just prior
to taking passage on the steamer, defendant's conduct was not all
she expected or anticipated; that he made many very slighting re-
marks about her father and mother, and in speaking about the wed-
ding "a most peculiar expression came over his face, and he sneered
and said, 'Well that whole thing was very peculiar,' " and she says
that in referring to a conversation with a friend, who had asked
him if he knew all the people who were to be at the wedding, to
which he answered in the negative, he told her that this friend re-
marked, "I call that a damned insult."  She also says: "There were
other disagreeable things, but that [meaning the above] is  the
one that stands out most clearly in my memory."  She also, in
this connection, testitfied: "Of course his sneers at mother and
father were harder to bear than anything else."  She refers to an in-
cident on the steamer just before sailing, which caused her to feel
"very much neglected."  She says: "About an hour before we sailed
I could not find Dr. Rindlaub, and I was terrible anxious, be-
cause I was afraid he might have gone ashore and might be left,
and we sailed before I knew whether he was on board or not.  He
had been out some time before he came on deck, before I saw
him.  When he came he said he had been writing letters in the
cabin.  Q.  What was his manner on that occasion?  A.  Perfect
indifference."

Again, she testifies that: "He didn't pay any attention to me at
all on that trip.  When I showed him any affection when we
were alone in our stateroom, he would push me away from him
and shake me off.  If I took hold of his hand, he would shake my
hand away."  A little later she testified, "I was very unhappy all
the way through the trip."  At Jerusalem she asked the guide to
purchase for her a little Bible bound in the wood of the olive tree,
which he purchased, and she says: "I had a dreadfully unhappy
time with Dr. Rindlaub because I spent $2.50 for that Bible.
He walked the floor he was so white."  Just before reaching Con-
stantinople she was confined to her bed five days, and she swears
that during that time: "He left me entirely alone.  I was very de-

pressed and very unhappy. It was not entirely his not being there, but it was the way he acted when he did come. He was so indifferent to me; he didn't want me to touch him he wouldn't sit beside me; I·can't tell exactly, only absolute indifference." At Cairo she was ill with pneumonia, and had a nurse, and during such illness Dr. Ring was called, and among other things eggnogs and port wine were prescribed, and she says: "I remember there were so many things that made me unhappy during that illness. One thing was the disgust of the doctor and his dissatisfaction about having to pay for the nurse's meals'." "It seemed to me that the only subject of conversation that he ever had when he came into my room was the extra expense that my illness was causing." "I don't think he ever saw me drink an eggnog without talking about it, and saying it was perfectly ridiculous that our expenses were running up so terribly." "And he stormed and scolded about what he had to pay for the port wine. I was very unhappy about the matter." In going from Alexandria to Naples she says she asked defendant if he could not get another stateroom, and this "simply brought forth another tirade on the extra expense that my being ill had caused." "He didn't tell me whether he could get another stateroom or not, but simply that he would not try." "I was in bed, and very, very weak." "I was horribly depressed; I was in perfect despair." She claims that while in such weakened condition defendant compelled her to travel and sight-see against her protests that she was unable to do so. She speaks of having left her jewels under her pillow in Rome, and of the doctor returning for them while she continued the journey to Florence. The next morning she hired a cab at the hotel and met defendant upon his arrival, and she then testifies: "When I saw his face, when he got off the train, I realized that he was not quite the man I had been idealizing. He was ugly looking, and when he caught my eye he looked as if he hated me." And she then goes on to narrate a conversation in which defendant severely reprimanded her for being there, for hiring a cab at the hotel, instead of going out on the street to get it, where she could have gotten it much cheaper, etc.. Plaintiff testifies to her weak condition when they reached Heidelberg, where they were obliged to walk the length of a long train,. and she told defendant that she could not carry certain bags.. Thereupon she handed them to a porter, and "Dr. Rindlaub grabbed the bags away from him and turned to me and hissed at me, 'You

—24—

will carry these yourself' and put them in my hand, and I had to carry them back to the station. I think I cried most of the rest of the night on the train."·

She details another unhappy occurrence at Cologne,. in narrating which she says: "Dr. Rindlaub always belittled everything I did and everything I was all along the trip. He was constantly making me feel that I was very poor in a money way. * * * He used to do it mostly by insinuations. He often referred to my lack of education, my poor intellect. I could not pack his things as he wanted them packed." During such quarrels she says that defendant, in effect, accused her of marrying him for his money, whereupon she threatened to go home and leave him, and that she meant it. She also complains of his alleged refusal to take her to any opera or theater while in Paris. On the return trip she says his treatment was about the same. When asked to sum up in a general way how defendant's demeanor towards her was on this entire trip, she answsred: "It was very indifferent, but it was more than that. He made me feel that I was so far beneath him in every way; that I was deficient in every womanly quality. She says she believes she saw him taking morphine twice on their return trip. They returned to Fargo some time in May following, and shortly thereafter took up their residence in what she designates as a small house without modern conveniences, and she testifies that during that summer defendant was very indifferent to her. She testified to sleeping on the porch two nights during that summer because she could not endure sleeping in the house. She says he stayed out nights a great deal, and "he used to tell me it was none of my business where he went; that was his usual answer, or else ignoring the question and simply sneering in my face." She says: "I went without help from before Thanksgiving until after Christmas. I was without help most of the time." She complains that the doctor compelled her to burn lignite coal, which was kept in a shed out by the alley, and was in large chunks, which had to be chopped, and she had to do this work and build the fires.

In the autumn of 1903 she sent for her father, and she says: "I wanted to go home. * * * I had endured things as long as I could, and Dr. Rindlaub told me that it was hell to live with me." Her father succeeded in persuading her to remain and try once more, but she says things went on after that just about as they had been going before. "Perfect indifference! I was sneered at,

everything I did. I used to entertain his friends continually. I was nothing but a servant in the house." She also accuses defendant of making fun of her looks when she was pregnant. That summer they visited his parents at Platteville, Wisconsin, and from there plaintiff went to Chicago to visit, defendant returning home, and plaintiff says that defendant told her while in Chicago to procure whatever she needed for herself and for the baby, and she testifies that she purchased a beautiful little outfit for the baby, the bill for which was $111, and she says that on her return defendant's attitude towards her had changed entirely from what it was at Platteville. "His manner was something I couldn't describe. He sneered at everything I did and everything I was. * * * When I showed him the baby clothes, * * * he walked up and down the room white as a ghost, with almost a terrible expression on his face, and he said, 'I would like to know what these are going to cost.' I told him. Then he flew into a terrible rage, asked me if I thought he was a millionaire;" and she swears that he compelled her to send these baby clothes back, and that her father gave her $50 after that for the baby's clothes. Later she says that she was compelled to entertain his guests and patients at dinners long after she ceased to be presentable on account of pregnancy. "And before confinement our maid went, and from that time on I did my own work, and of course in that house and with the arrangements of the coal and the chopping of the lignite and the chopping of the wood it was very heavy work, and soon after that I began to suffer excruciating pain, and was very, very ill all the time. When I would tell Dr. Rindlaub that I was ill he would sneer at me; tell him how my back ached he would say, 'How would you like to have the backache all the time?' Tell him it hurt me so much to carry these heavy loads, and carry water up and down the stairs and fill the stoves, he would say, 'Well, didn't Dr. Darrow say that exercise was good for you?' * * * I can't remember, for months, surely for weeks and weeks at a time, that he ever spoke a civil word to me in that house, unless, of course, we had guests in the house. * * * He didn't treat me as if I was a human being; didn't seem to look upon me in that way." Just before Bruce was born she says she was awakened in the night with terrible suffering, and thought she was about to be confined, and she awakened the doctor and told him about it, and he said, "Oh, Lord, I wish you would keep still and let

me sleep," and he turned over, and she suffered the rest of the night alone. The next morning at breakfact she said to him, "I can't stand it to be treated that way," and he said: "If you can't stand it you know what you can do, don't you? * * * If you can't stand it, you can go." At another time, when she put her arms around him in an affectionate way, she says: "He would throw me off and make very unkind remarks. One thing that I remember he said to me was that it wasn't necessary to slobber all over a person to let them know that you care for them; that that didn't mean anything; that I was nothing but an old hypocrite anyway." When she was carrying Bruce, their first child she says defendant accused her of being crazy. In this connection she refers to the time when she was confined to her bed and was very ill, and the defendant stood at the foot of her bed and looked down on her and said, "Maie, do you know that your mother is crazy, and you are just like her?" and she says, "I remember that I cried and sobbed and cried, * * * and he went out and left me." A little later she testifies as follows: "Q. Did he ever speak of you as being a hypocrite? A. Yes, very often. I used to meet him at the door when he came home and kiss him, and it was at these times that he would tell me that I was a hypocrite; that I didn't mean anything that I did. * * * Q. Did he ever make any statement criticising your father's manners or your mother's manners, and if so what was his way of making such criticism? A. Oh, father and mother were never spoken of in any way except with a slur or a sneer. That was so from the first of our coming home. * * * It hurt me more the things that he said of my father and mother than what he said about me; he could say anything to me, and it would not hurt me half as much." She says that as a result of the birth of Bruce she suffered laceration, and that on the fourth or fifth day thereafter Dr. Darrow performed an operation on her with no anæsthetic, and this in the presence of Dr. Rindlaub, and she says she suffered a long time from that operation, and "was in a tense kind of nervous condition." In speaking of his general demeanor towards her she used the following expression: "I never knew when there was going to be an outburst. It would come sometimes out of a perfectly clear sky. I never knew from our conversation or anything that had passed before, but often I could tell from his face, because it would generally be grey, and have those lines about

his face. His expression at such time is something I hardly know how to describe, excepting he expresses fury and hate; he hated me, and it showed in everything he did; everything he looked. There was one expression that at times when he was terribly angry with me I used to see, and that was a drawing of his upper lip so that his eyeteeth showed. It was like a dog when it snarls at you, unnatural to human beings." At another place she testifies that he repeatedly called her a liar. Again: "He used to tell me that my room was better than my company."

Plaintiff makes mention of a luncheon which she gave in honor of defendant's mother, and she says: "Instead of being pleased he was furious about it, because he said it threw Dr. Elizabeth and Julia (his sisters) in the shade; they were giving receptions with us, and he said it was a very selfish thing for me to do." And she goes on to say that the doctor's relations at such receptions had a "sneer on the face of every one" every time she spoke. She also testifies that defendant told her she lied when she disclaimed any intent in giving such party to "throw Dr. Elizabeth and Julia in to the shade." She recounts a scene just after the birth of the second child, in which she says as the defendant was going out of her room that night "he laughed and screamed just as I had, and mocked me just as I had screamed, very loud, looked at the nurse, and laughed." She also says: "He called me a damned liar on all occasions." She narrates trouble between them over certain ladies, referred to in the record as ladies numbered 2 and 3, with whom they both, and especially the defendant, were on very intimate, friendly and social relations, and she speaks of a conversation regarding certain gossip on account of the doctor and these ladies over attentions shown them by him, and she refused to tell where she heard it, and she testifies: "He said that this gossip was absolutely groundless, that I had made it up entirely, of course calling me a liar and a sneak and a coward, and I was stabbing people in the dark." She says she afterwards put her arms around him and said: "'Jack, don't you love me now?' He pushed me away. When he did that I said, 'You know I don't believe that you ever did anything wrong' Q. Why did you tell him that? A. I didn't believe that he had done anything criminally wrong. * * * That same night I * * * told him the same thing. I said, 'You know I don't believe that you have ever done anything criminally wrong.'"

She also narrates a scene which took place in the doctor's office in the spring of 1906, during which she, the defendant, lady No. 3, and Dr. Martin Rindlaub were present, and in which she swears that lady No. 3 and defendant took her to task about such gossip, and that lady No. 3 said, among other things, that she was demented, and "You wouldn't have any such notions as this if you were not demented, and every one knows you are," and she says that defendant affirmed everything lady No. 3 said. "Q. I think you told us yesterday that you had admired this woman's intellect, and looked upon her with a great deal of respect and esteem; that was the truth, was it? A. Certainly; I knew her from the time I was a little girl, and respected her in every way." Plaintiff found certain letters in defendant's pocket written to him in May, 1906, by lady No. 2 while on board steamer en route to Europe, and when asked what effect, if any, they had on her, she replied, "It was one more terrible thing piled on to everything else." When considered, however, in the light of the facts disclosing the relations between the parties as shown by the record, we fail to see anything in the letters which could reasonably inflict upon plaintiff grievous mental suffering. The ties of friendship between them were, to plaintiff's knowledge, akin to those of brother and sister, and such friendship had existed for years prior thereto, as plaintiff well knew.

On cross-examination plaintiff was asked if she had fully narrated the story of her trouble, to which she answered, "I have not told a hundredth part." And she was also asked, "Has Dr. Rindlaub no virtues?" to which she answered, "I couldn't find any, and I lived with him four years." The latter statement was somewhat modified thereafter. From the foregoing it will be seen that the picture, figuratively speaking, that plaintiff has painted of her husband is of the darkest hue. Many of the charges are very serious, and, if true, stamp defendant as a most villainous scoundrel.

How stands the proof? In answering this question we shall apply well-recognized tests in weighing the testimony of the various witnesses, and if any of them have exhibited an inclination to color or to exaggerate the facts, or have been successfully impeached as to material portions of their testimony by other credible evidence, either direct or circumstantial, their testimony will be given such credit only as in view of such facts it appears to us it is fairly and justly entitled to.

In the nature of things the plaintiff's case, in so far as her cause of action based on extreme cruelty is concerned, rests largely upon her own testimony, as acts of cruelty by either spouse towards the other are usually inflicted in the privacy of the domestic circle. Plaintiff has narrated a most remarkable, and to our minds, a most unnatural and incredible story. Commencing almost immediately after the wedding, and continuing throughout their cohabitation, she would have the court believe that the defendant was not only extremely cruel, but villainously brutal towards her; that even antedating the marriage he was so inconsiderate of her comfort and happiness, and was so mean and stingy as to reserve cheap second or third class staterooms for·their bridal tour. That the latter complaint, as well as others of the same general character, is unfounded is most effectually demonstrated by the evidence even of the plaintiff herself, which shows that he was most lavish in the matter of providing her with every comfort and luxury which money could purchase. In expressing her satisfaction with purchases made by defendant while in Europe, she testified, "They were utterly beyond anything I ever thought of possessing." We cannot believe that plaintiff has any just or reasonable ground of complaint on this score, and we are forced to the belief that plaintiff, in referring to the manner in which defendant "stormed" at the extra expense on account of the eggnogs, port wine, nurse's meals, etc., necessitated by plaintiff's illness while on their wedding tour, intentionally exaggerated the truth, and sought to mislead the court. From a careful reading of her testimony we are inevitably forced to the conclusion that plaintiff has, in many particulars, sought to create in her favor an erroneous impression regarding the facts. The incidents above mentioned; her reference to the "terrible rage" of defendant over the purchase of the baby clothes and compelling their return, regarding which she was forced on cross-examination to admit, in effect, that she had not been fair with the court, and other instances too numerous to mention, serve to convince us that plaintiff was not, in narrating her story, "as fair as I possibly could be" (quoting her words). Much of plaintiff's testimony is not only very unreasonable and improbable upon its face, in view of other conceded or established facts inconsistent therewith, but it is most effectually impeached by witnesses having no especial interest in the case, as to nearly every material incident where there were witnesses to the transaction. Not only this, but

as we shall see, the evidence discloses that throughout the period of nearly four years during which they cohabitated together plaintiff wrote many letters to defendent, which, in the language of Chief Justice Bartholomew in Mahnken v. Mahnken, supra, "might stand as models for happy, lighthearted, and affectionate wives to send to absent husbands," which written expressions of wifely love and affection were reciprocated by defendant, as shown by his letters. In the light of this correspondence alone, as well as letters written to others by plaintiff, it is difficult to give credence to plaintiff's story of defendant's brutality. We will refer to such correspondence later. At this time we will refer to some of the other impeaching evidence.

Regarding the incidents which took place on the steamer just before they sailed for the Old World, it will be remembered that plaintiff positively testified that defendant left her alone for about an hour before they sailed, and she could not find him, and she says, "We sailed before I knew whether he was on board or not," and she further says, "Of course, I felt very much worried and filled with anxiety, and felt very much neglected just then." She positively denies that she told Major Darling that defendant was down writing a letter, but Major Darling testified: "We went on board, and I found Mrs. Rindlaub on the upper deck, * * * and I * * * asked her where the doctor was. She says, 'He is below writing some letters.' I hunted him up, and found him there, and he says he will be through in a few minutes and be up on deck, * * * and we went ashore and very soon the boat pulled out. We stood on the end of the dock * * * as the boat pulled out into the stream, and Mrs. Rindlaub and the doctor were up on the deck and waved their hands to us; I saw them there."

Regarding defendant's treatment of plaintiff while on this wedding trip Dr. Ring and Rev. Dalzell both disagree with plaintiff's story. Dr. Ring testified: "Q. Well, was his demeanor towards her that of indifference, Doctor? A. I think not. Q. How was he— was he pleasant? A. I think he was; I never saw him otherwise, in fact, in the times that I saw him." Rev. Dalzell: "Q. What would you say as to the conduct of Dr. Rindlaub as being lacking in attention to his wife, as they traveled together in the car, which an affectionate husband would display towards his wife? A. He seemed solicitous for her welfare and comfort. Q. In your shopping in company with Dr. and Mrs. Rindlaub what did you find to

be the disposition of the doctor in the matter of making purchases; was he free, or was he stingy with his money? A. He seemed to be free and generous." The witness Annie Conlin, who had various opportunities of witnessing defendant's treatment of plaintiff while she was nursing at their home, testified: "I would say he was a good man as I have ever been around with in confinement, and then after the baby was born, he stooped down and kissed her, and he said, 'Maie, I will telephone over to your father and mother,' and he went into the next room and telephoned, and they came over." Edith Nelson, another nurse at their home, testified: "Q. How was he as to being affectionate or lacking in affection in his treatment of Mrs. Rindlaub; I mean in the matter of greeting her when he would come into the house or go away? A. Agreeable; he used to kiss her when he would come in. Q. Did you observe that during the six weeks of your last stay there during the fall of 1906? A. Yes, sir. Q. Did you see him kiss her more than once? A. I think so. Q. Was there any difference discernible to you in her treatment of him during that period, as to whether she responded to his greeting affectionately, or appeared to be lacking in affection? A. Why, I should say rather lacking. Q. How would you describe that to the court? A. Well, she would oftentimes leave the room on the doctor entering it, and the haughty appearance; also the inclination of the head when he kissed her. Q. Turn her cheek to him? A. Yes, sir. Q. This, now, refers to the last six weeks' stay in the house? A. Yes, sir." Sena Braseth, a cook in the Rindlaub home from November, 1904, until July, 1905, testified: "Q. During this time what was the doctor's conduct towards his wife? A. I never noticed it was anything but pleasant. Q. How did he greet her, as far as you know, when he would come home? A. Why, he would say, 'how-de-do, dear?' and lean over to kiss her. Q. What would she do? A. Why sometimes she would kiss him, and sometimes she would turn her face away." Mrs. Caroline Swanson, who was employed as a nurse in their family during the Christmas season of 1903, testified: "Q. What was the doctor's treatment of his wife during that period, Mrs. Swanson? A. Why, very pleasant; everything was very agreeable as to my—what I saw at the time."

Plaintiff positively denied that she ever stated to the witness Sundberg, or any one else, that defendant had had criminal relations with the lady known in the record as No. 3. She also posi-

tively denied telling Dr. Darrow the same thing, but the witness Sundberg testified just as positively to the contrary. We quote from his testimony as follows: "But she was very much excited, and it was only that one thing that she—she would go back to the same thing, that it was so, that this lady was his mistress, and that they had positive proofs." The witness Dr. Darrow testified: "Q. Did she tell you anything about having any proofs of No. 3 being her husband's mistress? A. Why, she said that her father had proofs." The witness Mrs. Kitely, who was a friend of the family, and visited them on several occasions, gave testimony as follows: "Q. * * * Did Mrs. Rindlaub give the name of any lady with whom she claimed her husband was criminally intimate? A. Yes, sir. Q. I am showing you this exhibit; is the one marked No. 3 the name of the lady to whom she alluded? A. Yes, sir. Q. Now, what did she say about there being intimacy between this lady and her husband? A. Why, she said she had learned that this lady had been the doctor's mistress long before she married him, and he had kept it up. Q. Since the marriage? A. Since the marriage." At another place plaintiff positively denied telling Dr. Darrow that defendant had knocked her down and kicked her; but the doctor testified on this point as follows: "Q. What did she say to you? A. Well, she said that she had had trouble with Jack, and that he had knocked her down and kicked her."

The following quotations from the written correspondence tend to throw much light upon the real domestic relations of these parties, and furnish unmistakable proof that plaintiff has, to say the least, greatly exaggerated the facts regarding defendant's alleged brutal treatment of her. In October and November, 1903, plaintiff expressed herself in letters to the defendant as follows:

"Jack, my dearest: * * * Even though I can do so little for you, it is a great comfort to be where you can speak to me if you do want anything when you are ill. I hope that I may hear from you to-morrow or Sunday for I have worried about you a great deal, my sweetheart."

"My darling: * * * Whatever other worries and cares you have had, we have really had each other and have been happy in each other, have we not? * * * You must not mind if I am a terrible baby about being away from you for it is only because I love you so much and surely you want me to love you. * * * With all my love, Maie."

"Mine Libre: * * * I am heartless enough to be glad, dear, that you will miss me, for I miss you very, very much, but I hope that you may be comfortable and happy and that the house may run quite as I should wish to have it. * * * With a heart full of love, Maie."

"Always remember Jack that I love you very dearly and want so much to make you happy in all things, and do not let people say things to you which make you doubt me. We must learn to trust and believe in each other, my sweetheart, and then we will always be happy. Most lovingly yours, Maie."

"It is just because people are jealous of your success that you have these things to meet. They do not realize what a splendid, conscientious darling you are, and they cannot hurt you, my boy; can they? * * * You have been a darling to write to me so often and I love you all the more (if I possibly could) for doing so. Most affectionately, Maie."

"I have wondered so many times since you left me how wives can go away from their husbands and stay for months, I never dreamed that I could miss a person so much, and I think of you by day and dream of you by night, my own darling. How happy we will be when we are together again. Most lovingly yours, Maie."

On November 9, 1903, defendant wrote plaintiff: "My precious one: * * * I am going home now, but it isn't much like home without you darling. I long to see and take you in my arms, but it won't be long now. The days will soon fly by. With all my love, Jack."

In March and April, 1905, plaintiff wrote defendant: "Jack, darling: * * * Bruce and I cannot bear to sit in the den now that you are gone. It seems the loneliest place in the house and I seldom go in there at all, especially in the evening, for that is where we have our happy times together. Do we not, dear? * * * Most affectionately yours, Maie."

"Jack, my darling: You cannot think how happy your sweet letter made me and I am glad that you feel the baths may help you. * * * Bruce is getting so smart. When he had his apple to-day he took each piece of skin out of his mouth and gave it to me It was too cunning for anything. All day to-day he has been saying, 'Pa; Pa; Pa; Pa;' I know that he misses you, too, dear. * * * With a great deal of love, affectionately, Maie."

"Jack, my darling: Two letters from you today made me the happiest of wives, you sweetheart. I do love you so. * * * Not that I expect you to be ill, dear, but if you are half as lonely as I it would be a sore temptation. * * * Father and mother were delighted with your message to them, dear, and send their love to you. * * * Don't worry about anything, dear, but just get well and know that I am ready to come to you at any moment that you want me with Bruce or without Bruce, just as you think best. Of course, I have no idea that you would think of our coming, but we are ready to if you do. With a heart full of love, Maie."

"My darling Jack: * * * We came home quite early and Oh, darling; you can't think how lonely the house seems, yet I am just as glad as I can be that you are to have such a nice rest and I feel sure that it will do a great deal of good. * * * So you see, dear, your wife and little son are beautifully taken care of, thanks to your generosity in letting us have these people about us. * * * With all my love, affectionately, Maie."

"My darling boy: * * * Darling, your letters make me very happy. I do think that you and I are nearer and dearer to one another every day that we live and how beautiful to have it so. * * * With a heart full of love, and hoping that you are ever so much better, believe me, Your affectionate wife, Maie."

"My darling boy: * * * It is after nine, far past my bedtime, so good night dear, I wish I might have a good night kiss and to sleep with my hand in yours, darling. Nearly every night I dream of you and it is so hard to wake up and realize that you are away."

On August 3, 1905, in a letter written by plaintiff to defendant's brother, plaintiff expresses herself as follows: "I have not been feeling as well lately but I must expect that of course. Jack is so sweet and considerate, however, that it helps a great deal over this most trying time."

Many letters from defendant to plaintiff are in the record, all of which contain very affectionate expressions, and none of which disclose the slightest intimation of any domestic unhappiness. It is not only difficult, but impossible, to reconcile these written evidences of affection with the testimony of plaintiff. The attempted explanation by her of her letters is very unsatisfactory, and, furthermore, defendant's letters to her are equally as convincing as hers in refuting the fact that any such unhappy relations existed as were

detailed by plaintiff upon the witness stand. The proof offered by plaintiff in corroboration of her testimony relative to alleged extreme cruelty is also somewhat lacking in its convincing character. Several medical experts, as well as other witnesses, testified relative to the physical condition of plaintiff. Some of them contrasted her appearance after her return from the wedding tour with her appearance prior to the marriage, and gave it as their opinion that there was a marked change, and that she had apparently lost much of her girlhood vivaciousness. The medical experts gave testimony tending to show plaintiff to be suffering with nervous prostration, which in their opinion might be caused by "worry, trouble, brooding, neglect, or severity," as stated by Dr. Sweeney, a nerve specialist of St. Paul, who, on September 27, 1907, first met and professionally treated her. Dr. Sneve—another nerve specialist of St. Paul—testified to meeting plaintiff in a professional way in May, 1907, in Dr. Sweeney's office, and he gave it as his opinion that: "She was unhappy; had been unhappy and been quarreling, and this had extended over a long period, and it produced mental storm." Dr. Aroty of Moorehead was called on November 22, 1906, the day this case was commenced, and treated plaintiff at her father's home in Fargo, and Drs. Lippincott and Wheeler of Seattle saw and treated her in August, 1906, and these doctors testify to her nervous breakdown. The testimony of some of these experts is based upon knowledge acquired long after the action was commenced, and that of the others upon knowledge acquired by them after or just prior to the bringing of the suit, and while the same was in contemplation by plaintiff. While this is not alone sufficient to discredit such testimony, still it is a somewhat important circumstance to be taken into account in weighing the same. Furthermore, Exhibits F, G, and H, which are photographs of plaintiff taken while in Alaska in the fall of 1906, furnish quite convincing proof of the robust physical condition of plaintiff at that time.

The witness Florence Nugent, an intimate girlhood friend of plaintiff, and who visited frequently at the Rindlaub home, gave it as her opinion that plaintiff was very unhappy, although, as stated by the witness, the plaintiff "never has said anything to me at all of any trouble." At times when she was present she says defendant was very indifferent, and didn't have much to say. Among other things, she testified: "Q. What was his manner to Mrs. Rindlaub whenever he spoke to her or answered any inquiry from her? A.

Very short, gruff; never had much to say to her. Q. * * * Was it in an angry tone or otherwise? A. No; not in any angry tone, just seemed perfectly indifferent." She testifies that about November 7, or 8, 1907—nearly a year after the action was commenced—she saw little Bruce walking with defendant along Broadway in Fargo in new and wet snow. The witness, Miss Mann, gave testimony substantially the same as the last witness, also corroborating her as to the incident regarding Bruce and his father walking in the snow down Broadway.

The witness Olson, a coachman for the defendant for about six months in 1904 and 1905, and whom the testimony shows was discharged from such employment by defendant, gave the following testimony relative to alleged cruelty: "Q. Did you use to observe the actions of Dr. Rindlaub toward his wife, from time to time? A. Why, he was always smiling and good-natured when there was anybody around. When nobody was around, he would speak up kind of nervous and cross. Q. Was that his general conduct when other people were not around and in sight and hearing? A. Yes. Q. For how long a period did you notice that? A. Oh, for a week or two. Q. How did he act towards his wife? A. Why, when I generally seen him he was kind of smiling, and so on, and sometimes Mrs. Rindlaub had red eyes, and looked like she had been crying."

The witness Mrs. Grant—a very intimate friend of plaintiff and her parents for many years—gave testimony similar to that of the witnesses Florence Nugent and Miss Mann. She also details certain conversations with defendant in the spring of 1907, in which defendant had asked her to aid in bringing about a reconciliation, but that, owing to certain statements or insinuations by the doctor regarding certain statements he claimed Mr. and Mrs. Douglass had made concerning her, she did nothing. On cross-examination this witness states that she communicated to plaintiff and her mother the substance of these conversations had with the doctor, and that there was no expression of any wish upon their part for reconciliation, and, as far as she could understand, the plaintiff and her parents were all three bitterly opposed to a reconciliation.

The witnesses Etta Hill and Mrs. Morris gave depositions to the effect that they were passengers on the steamer from Hoboken to Cairo, and they testify to their conclusions that plaintiff was unhappy, and that the doctor seemed indifferent and negligent to-

wards plaintiff, but the first witness testified that during the time Mrs. Rindlaub was sick she did not see Dr. Rindlaub away from the hotel, and the latter witness testified that at Naples she saw Mrs. Rindlaub carrying a heavy bag about a block and a half, and witness thought she had been too sick to do this.

The witnesses Mrs. Lasson and Mrs. Clark merely testify to Bruce's actions in 1907 in not wanting to accompany his father from the Douglass home, and they throw no light upon the issues involved.

The witness Mary Kingsley merely testifies that she was at the Haggert wedding, and overheard defendant ask plaintiff if she could not walk home. The proof shows that plaintiff was attired in a delicate gown, and the walks were muddy, and this incident is relied on as a circumstance showing extreme cruelty on defendant's part.

The witnesses Irene Clark and Hazel Hull merely refer to Bruce's actions in 1907 in not wanting to leave the Douglass home to visit his father.

The witness Dickinson—who is an employe of the steamship company—testified by deposition as to the location of the cabin which defendant engaged.

The witness Frances Sill testified by deposition that she saw Mrs. Rindlaub carrying a very heavy bag while they were going to the train at Naples, and she says the doctor was walking beside her and did not carry anything, and she further says: "He was pale and haggard, he was always surly, very surly and very disagreeable." "Q. Do you know how far it was she carried that heavy bag? A. I should think it was the distance of perhaps less than two of our blocks." Later she testified: "Q. What did you see as to the manner in which he acted toward her at the various times that you saw him on that trip? A. I should say that he was very disagreeable, very uncouth, and rather an unusual man; especially we were very much surprised to learn that they were bride and groom. I had supposed that they had been married a long while, and that he was very much broken down in health, and in every possible way he was a man that was completely broken down I should say; he was very disagreeable."

The witness Johnson—a very intimate friend for over forty years of plaintiff's father—called at the Rindlaub home in company with plaintiff's father four days prior to the commencement of the

action, and he corroborates plaintiff regarding the incident in which, as they were leaving the house, plaintiff said to her father, "Give my love to mother," to which the doctor replied in a sneering tone of voice, "Your love to mother, eh?" and he says the doctor was in an agitated condition at the time.

Edna White testified by deposition to meeting and forming an intimate acquaintance with plaintiff while in Alaska in the fall of 1906. She testifies to plaintiff's nervous condition while there. It is apparent from her testimony that they became chums, as they were together most of the time, and occupied the same stateroom while going from Marble Creek to Ketshikan and from the latter place to Juno.

The witness Mrs. West testified that in June, 1906, she met the parties at Detroit, Minn., and defendant seemed to be rather cold and indifferent, and that there was very little conversation between them. This witness was a patient of defendant, and stayed at defendant's home in June, 1906, while receiving treatment from defendant, and, among other things, she testifies as follows: "Q. Did you observe, while there, the treatment of Mrs. Rindlaub by her husband? A. Yes. Q. State what it was; whether it was kind or otherwise? A. It was not kind; he seemed to be rather cold and indifferent. Q. What did he say or do? A. I could not say; there was not very much said. Q. Do you mean by that that he seldom talked to his wife? A. Seldom, while I was there. Q. What is the fact as to whether he talked to his wife during mealtimes? A. There was very little conversation. * * * Q. What is the fact as to whether during your stay in his house Dr. Rindlaub found fault with his wife? A. I do not remember hearing him find fault with his wife, except once for not sending the horses for me. Q. What did he say? A. Nothing objectionable. Q. But did he scold her? A. It was very like scolding. Q. When Dr. Rindlaub talked to his wife, what was his manner, as to whether it was cross or good natured? A. Cross; I should have said cold. Q. What is the fact as to whether or not Dr. Rindlaub frequently talked with his wife? A. I do not know whether he talked with his wife or not. Q. Did he talk with her much in your presence? A. On common-place things." On cross-examination she testified: "Q. This coldness or unkindness was in the form of indifference to her? A. More in manner than speech. Q. He said no unkind words in your presence? A. You would not call them unkind. Q. It was simply

the look in his face that made you think he was cold and indiffer-, ent? A. Yes. Q. You mean in addressing conversation to her? A. Yes. Q. The doctor is not a very talkative man, is he, Mrs. West? A. He has not been with me. Q. Did you say something about his speaking to her in regard to horses? A. Yes, one time, I walked from the office, and he did not like it, but thought she should have sent the horses for me, and he scolded her for not sending them. Q. The doctor wished you to have use of the horses while there? A. Yes. Q. You said that he spoke to his wife very mildly, or what did you say? A. I said that he scolded her very slightly. Q. It simply annoyed him because you, a guest of the house, was not properly supplied with the use of the carriage? A. Yes, I think so. Q. You recite this as the only fault-fiinding that you personally heard while you were there in the house? A. Yes. Q. There were no bitter words passed between them in relation to this matter? A. No; not that I know of. Q. This did not produce a scene of any kind, crying, etc.? A. There was no scene; she was sorry herself. Q. And she considered the correction just? A. Yes; she did. Q. You say that you did not see the doctor angry with his wife at any time you were there? A. I did not hear him say any angry words. * * * Q. Now, you told in your evidence everything that you saw and heard while you were in the home of Dr. and Mrs. Rindlaub? A. Yes." Comment on this is unnecessary. It falls far short of corroborating plaintiff's story of cruelty, and in fact is more in defendant's than in plaintiff's favor.

The next witness—Ella Berg—was a nurse girl at the Rindlaub home from October, 1904, until June, 1905. She was asked to state how Dr. Rindlaub acted towards his wife when they were alone, to which she answered: "I can't hardly give any answer that will be anything." She then testifies: "Q. Did he treat her at such time affectionately or coldly? A. Coldly, I think. Q. When they were at the table, at their meals together, did or did not Dr. Rindlaub have any conversation with his wife, and what was his treat- ment of her at that time? A. Yes; he had conversation with her and it was all right as far as I heard." She corroborates to a certain extent the plaintiff's testimony regarding the incident of her going into the guestroom with her baby on a certain occasion, and remaining there two nights and a day, although the witness does not remember how long she stayed in there. Her testimony is of

little importance as throwing light upon the alleged acts of cruelty complained of.

The record discloses that much of the testimony of plaintiff's witnesses was procured by plaintiff's father, with whom the witnesses talked prior to giving their testimony, and it is but natural that he would put forth every effort to procure testimony as favorable to his daughter as possible. Like efforts may have been employed in procuring testimony in defendant's behalf. These are matters which we have duly considered in weighing the testimony of the various witnesses.

Space forbids a more extended review of the evidence bearing upon this feature of the case. Suffice it to say that in our judgment plaintiff has most signally failed in proving the truth of the facts relied on to establish her second cause of action by that degree of proof exacted in cases of this character. It is a significant fact that, with but a few exceptions, all the servants, nurses, and other witnesses having the best opportunities of acquiring knowledge of the facts are arrayed against plaintiff upon the issue of extreme cruelty. It stands out as an established fact in the case that to plaintiff's knowledge defendant is and was, during all the times referred to, afflicted with an incurable malady, and at frequent intervals, subject to unendurable pain, necessitating the use of narcotic drugs to relieve such pain. This fact, no doubt, furnishes some explanation for much of the demeanor of defendant as narrated by plaintiff and her witnesses; and yet, in the light of his said affliction, there has been apparently no inclination shown by plaintiff to exhibit the least degree of leniency or forgiveness. That there was more or less domestic troubles is no doubt true, but this is not an unusual coincidence in married life. The absence of these are the exception—not the general rule—as common experience teaches us.

From an examination of plaintiff's testimony we are impressed with the belief that the chief aim of her counsel throughout the trial was, not so much to establish extreme cruelty, as to lay a foundation upon which to ask a divorce upon her first cause of action, to-wit, habitual intemperance. Such object appears from the testimony to be uppermost in the contemplation of plaintiff and her counsel throughout the proceedings.

In concluding what we have to say upon this branch of defendant's appeal we feel constrained to differ with the learned trial court

upon the facts presented, and feel obliged to say that in our judg-ment the evidence does not warrant the findings and conclusions, the correctness of which is challenged by appellant's counsel.

This brings us to a consideration of the second branch of defend-ant's appeal, namely, his counterclaims for a divorce from plain-tiff on the grounds of extreme cruelty and willful desertion. In considering this feature we shall asume that the trial court properly denied any relief to plaintiff on her first cause of action, the cor-rectness of which holding we will consider later. Does the evi-dence warrant findings of extreme cruelty or willful desertion on plaintiff's part? This question was answered in the negative by the trial court, although that court expressly found as a fact "that plaintiff did charge defendant with being criminally intimate with other women." And also: "That the ladies with whom plaintiff accused the defendant of having criminal intimacy were and are of the highest standing in the city of Fargo, and are of unimpeachable character, and in every way above suspicion." The learned court evidently took the position, which is not without some support in the evidence, that defendant's relations with these ladies were not wholly free from criticism, and that he is not entirely blameless in the premises. In other words, that there are mitigating circum-stances in plaintiff's favor sufficient to warrant the denial to de-fendant of any affirmative relief under his first counterclaim. While, for like reasons, we have concluded not to interfere with the trial court's disposition of this feature of defendant's appeal, we deem it proper to say that it is established by the record beyond ques-tion, and to our entire satisfaction, that plaintiff openly accused de-fendant of criminal intimacy with another woman. This is shown by the witneses Sundberg, Mrs. Kitely, and Dr. Darrow, and while disputed by plaintiff, she does not deny that she accused him of intimacy with such women, but denies that she ever, in effect, charged criminal intimacy. We cannot believe that all these three witnesses, even though strong partisans in defendant's favor, de-liberately falsified regarding plaintiff's statements to them as above referred to. What possible motive could they have had for so doing? Plaintiff expressly disclaims any belief as to the truth of such accusations, but on the contrary she and her witness, Mrs. Grant, as well as every person expressing any opinion on the sub-ject, unequivocally swear that the character of this lady, whom the witnesses Sundberg, Mrs. Kitely, and Dr. Darrow positively swear

that the plaintiff accused of being defendant's mistress, is absolutely above reproach. As testified by Mrs. Grant, in effect, there was no lady in Fargo whose reputation was of a higher character than such lady. We quote from her testimony as follows: "Q. You didn't know a lady in this town whose reputation was of a higher character than that of the third one of these ladies, did you? A. No, sir. Q. And her name is absolutely beyond suspicion as to her moral purity? A. I think so. Q. And didn't anybody in town question that statement? A. I think not, Mr. Watson. Q. If you dragged this town through with a fine tooth comb, you could not find a lady regarding whom the breath of suspicion would be less pointed than against the third one of those ladies? A. I think not. Q. That is true? A. I think so, Mr. Watson. Q. So that the circulation of these stories, by whomsoever they were circulated, was absolutely without foundation, and was a gross outrage upon both the doctor and this lady? A. Why, certainly." We are therefore forced to the inevitable conclusion from the evidence that plaintiff made the accusations complained of. There, no doubt, was furnished by defendant some excuse or justification for plaintiff becoming somewhat suspicious or jealous of this lady; but, in view of plaintiff's sworn statements that she never believed there were any criminal relations between them, she was certainly not justified in making such grave and serious accusations. Such accusations naturally caused public scandal, and could not but result in causing him grievance, mental suffering in bringing him into public reproach, scorn, and obloquy, and this, the plaintiff was bound to know.

In the light of defendant's serious physical condition, of which plaintiff was fully aware, it was doubly cruel on plaintiff's part to treat him as she unquestionably did treat him, not only in this, but in many other respects. That plaintiff falsely accused defendant of assault and battery against her person by striking or kicking her while she was large with child is even admitted by plaintiff, and this, above all other charges, would surely bring defendant into bad repute and public scorn. The evidence also discloses that, while defendant, who, as before stated, was afflicted with an incurable, and at times an unendurable malady, was practicing his profession, when, as his physician says, and as the lower court in effect found, he should be enjoying absolute rest and quiet, and was furnishing plaintiff a home with all the comforts and luxuries she could desire,

she secretly employed attorneys early in 1906, and later installed in defendant's home a female detective in contemplation of divorce proceedings, and at defendant's expense accompanied her father on a two months' trip to Alaska. Prior to her departure she played the part of a detective herself in securing what she deemed evidence of defendant's excessive use of morphine upon which to base an action for divorce. The deceitful methods admittedly resorted to by her to procure such evidence is quite indicative of her belief in the weakness of her cause. A meritorious case seldom requires in its preparation and support such extraordinary efforts as have been put forth by plaintiff and her counsel in this case. While on the Alaskan trip plaintiff wrote affectionate letters to defendant, and at the same time was consulting physicians in Seattle, who afterwards become witnesses in her behalf. Not only this, but she admittedly made a written computation of the estimated wealth and earning capacity of defendant for the undoubted purpose of basing an application for temporary and permanent alimony in her contemplated divorce suit. Shortly after her return to Fargo, and without the slightest warning to defendant, she left defendant's home and went to the home of her parents, taking with her their two children, Bruce and John, and on the same day caused to be served on defendant the summons and complaint herein, in which she accuses the defendant of the many acts of cruelty hereinbefore set out. If defendant was wholly blameless, and there were no mitigating circumstances, plaintiff's conduct would undoubtedly constitute extreme cruelty, entitling him to a dissolution of the marriage as prayed for, unless plaintiff has succeeded in establishing her first cause of action.

Upon defendant's last counterclaim, which charges plaintiff with wilful desertion on November 22, 1906, we are inevitably forced to the conclusion that defendant is entitled to the relief prayed for, unless plaintiff has successfully established her first cause of action, which we will hereafter consider. It is admitted that plaintiff on said date took their two chidlren, Bruce and John, and went to her parent's home, where she has ever since resided, and it is perfectly apparent that it is and has been, at all times since, her full intention never to return to her husband. Not only this, but it is undisputed that she took her departure as aforesaid without the slightest previous warning to defendant, and with a deliberate purpose of commencing this action, which she and her father, for many months

prior thereto, had been carefully contemplating and making preparations for bringing. It is impossible to imagine a stronger case of desertion unless it can be said that such conduct on plaintiff's part was legally justified under the evidence, in which event defendant, and not plaintiff, would be guilty of legal desertion. We are unable, for reasons already given, to reach the latter conclusion from this record, unless, as before stated, plaintiff has succeeded in establishing her first cause of action.

This conclusion brings us to a consideration of the merits of plaintiff's appeal. Such appeal challenges the correctness of the trial court's findings and conclusions upon the issue of defendant's habitual intemperance in the use of morphine. Owing to the length already of this opinion we shall dispose of this feature of the case as briefly as possible. Defendant is charged with the use of morphine, and other like narcotic drugs, to such a degree as to disqualify him a great portion of the time from properly attending to business, and which alleged habitual intemperance has inflicted upon plaintiff a course of great mental anguish. While it may not be material from a legal standpoint, we think the record fully justifies the assertion that but slight, if any, effort was ever put forth by plaintiff to save her husband, for whom she professed such devoted affection, from acquiring the terrible habit of which she now complains; her apparent desire being to secure evidence which would convict him of being guilty of such habit. She manifested no disposition to forgive and forget. The contrary is true of defendant, but his overtures for reconciliation were spurned by her and her parents.

Upon this appeal counsel for plaintiff contend for a reconstruction of our statute—section 4054, Rev. Code 1905—which will entitle plaintiff to a divorce, notwithstanding the fact, if it be a fact, that the morphine habit was caused by reason of the necessary use of such drug to alleviate pain and unendurable suffering. We do not thus construe the law, and in our opinion such a construction would do violence to the statute. If such a habit is reasonably and necessarily caused by conditions over which the victim has no control, it would be manifestly harsh and unreasonable to subject such party to such undeserved punishment. It would, in effect, be inflicting punishment upon the innocent. Such a condition is no less innocent, from the standpoint of the victim, than insanity. Both result from disease. We shall not attempt a review of the evidence

bearing upon this issue. It is too voluminous to permit even a cursory review thereof. It is sufficient to say that after a careful reading of the same we are fully convinced that the learned trial court's findings are in accord with the facts as we view them. Plaintiff's contention upon this issue is wholly irreconcilable with what must be conceded as an established and indisputable fact that defendant, during all the time of his cohabitation with the plaintiff, has, in a marked degree, maintained his pre-eminent standing as a specialist in his line, performing daily the most difficult operations intrusted to his care and skill. We are convinced that no one, under the evidence, can successfully contend that defendant's use of morphine incapacitated or disqualified him "a great portion of the time from properly attending to business." In the face of this stubborn fact, which stands out so prominently, it is difficult to believe that defendant's use of morphine reasonably inflicted "a course of great mental anguish upon" the plaintiff within the meaning of our statute above referred to. In the light of the facts as disclosed by this record we are impelled to the belief that plaintiff has been too diligent in discovering the shortcoming of her invalid husband and altogether too inactive in overlooking his frailties. A different course would have been more in keeping with her duty to her husband, her children, and the public. She has only herself to blame for the consequences.

Our conclusions upon the whole case are:

First. That the judgement appealed from, is so far as it grants to plaintiff a divorce, be reversed, and that a judgment be entered in defendant's favor dissolving the marriage relation upon the grounds alleged in his last counterclaim.

Second. That such judgment be modified so as to provide: That the custody of the children Bruce and John shall be, until the further order of the court, awarded to defendant, subject to the following conditions: That defendant shall not remove such children from this jurisdiction without permission of the court first obtained, and that plaintiff shall be permitted, during each afternoon between the hours of 3 and 6 o'clock, to visit said children at defendant's residence, when they are not at school, and that during the months of June, July and August, plaintiff may have the custody thereof, subject to defendant's right to visit them at least once each week for the period of one hour, and, in addition thereto, to take them to his home each Sunday afternoon between the hours of

3 and 6 o'clock; plaintiff, during the other months, to have the like privilege of taking said children to her home in Fargo each Saturday afternoon between the hours of 3 and 6 o'clock, the defendant to see that such children are safely transferred to and from plaintiff's home as aforesaid.

Third.  Also, that until the further order of the court the custody of the minor child, Newhall, be awarded to plaintiff, but defendant shall be permitted to visit such child at least once each week, for the period of one hour.

Fourth.  For the support, maintenance, and education of such children defendant shall pay to plaintiff the sum of $150 per month, payable each month in advance, during the times they are all in plaintiff's custody, and at other times the sum of $50 per month for Newhall, payable as aforesaid.

Fifth.  The homestead, consisting of the south 95 feet of lots 11 and 12, in block 33 of the original town site of the city of Fargo, is hereby assigned to defendant during his life, or as long as he continues to maintain it as his home; he to keep and maintain the same free of incumbrances of every kind or character, and at his death, or before, if he should intentionally abandon such home, the same shall become plaintiff's absolute property.

Sixth.  That the conclusions of the trial court numbered 9 and 10, which relate to the rights of the respective parties to certain personal property, including the wedding gifts, are hereby adopted unchanged as conclusions of this court, the judgment in this regard to be in conformity with the judgment heretofore entered by the district court.

Seventh.  The judgment of the district court, in so far as it awards to plaintiff attorney's fees and the costs and disbursements in that court as finally taxed and allowed, is affirmed.  There is hereby also allowed to the plaintiff, for suit money and attorneys fees in addition to the sums heretofore allowed by this court, the further sum of $1,200 and the payment of such allowances for attorney's fees and suit money shall be made by defendant to plaintiff within 30 days after the remittitur is filed in the district court.  Aside from such allowances no costs or disbursements in this court shall be allowed to either party.

The district court is directed to vacate its judgment herein, and to enter a judgment in conformity with this opinion.

Morgan, C. J., and Ellsworth, J., concur. Spalding, J., having been of counsel, did not sit; Crawford, District Judge, acting in his place by request.

Crawford and Carmody, JJ. A careful examination of the record convinces us that the plaintiff is entitled to a decree of divorce, custody of the children and alimony. Hence we cannot agree with the majority opinion and respectfully dissent.

## On Rehearing.

Fisk, J. (on denying rehearing). The petition for rehearing is denied, but in denying same we deem it proper to give a brief statement of our reasons for so doing.

The first ground upon which a rehearing is prayed for is that the time during which plaintiff was engaged in prosecuting her action cannot be considered in computing the statutory period of desertion, entitling defendant to a divorce. The history of this litigation, as disclosed by the record, furnishes a conclusive answer to such contention. Conceding the correctness, as a general proposition, of the rule now urged, but without deciding the same, it is, to our minds, entirely clear that plaintiff should not be permitted at this late date to invoke such rule. Such point is raised for the first time in her petition for a rehearing. It is a new point in the case, and has no place in her petition. Furthermore, it has been waived. At the time the case was called for trial in the district court plaintiff's counsel asked and obtained leave to serve and file an amended complaint. Thereupon defendant was permitted, by consent, to serve and file an amended answer, wherein the second counterclaim, alleging desertion on plaintiff's part, was incorporated as a supplemental cause or ground for divorce. Plaintiff's counsel characterized such pleading as a supplemental, rather than an amended answer, stating: "That is a supplemental answer, based upon a * * * cause of action for divorce arising since the filing of the other answer. *We have no objection to the amended answer, if your honor please,* but we desire the record to show that it was served as of to-day before the commencement of the case." Subsequently a reply was served, putting in issue the allegations of such supplemental answer and crossbill. Throughout the entire litigation, both in the district and Supreme courts, not even an intimation was made by plaintiff's counsel that they relied, or intended to rely, upon any such point in defense of such supplemental cause

of action.  Defendant has at all times asserted his right to recover
on such crossbill, and plaintiff makes no reply to such contention,
but the attitude of her counsel throughout the litigation amounts,
at least, to a tacit admission by them of defendant's right to recover
thereunder in the event the relief prayed for by plaintiff should be
denied.  In the light of the above facts plaintiff's counsel will not
be heard, at this late date, to change their attitude upon this feature
of the case.

Counsel assert, with apparent confidence in the correctness of
their position, that the majority opinion, in effect, overrules the cases
of Jasper v. Hazen, 4 N. D. 1, 58 N. W. 454, 23 L. R. A. 58, Dowa-
giac v. Hellekson, 13 N. D. 257-265, 100 N. W. 717, and Ruettell v.
Ins. Co., 16 N. D. 546, 113 N. W. 1029, upon the question of the
weight to be given the findings of the trial court.  Counsel are
clearly mistaken.  Jasper v. Hazen arose long prior to the enact-
ment of our statute providing for trials do novo in this court, and
the other cases relied on were *law* cases, and were not appealed
under the so-called Newman statute.  Hence such cases are in no
respect in point here.

With reference to that portion of the decree relating to the cus-
tody of the children nothing new is presented in the petition re-
quiring further notice.  We have, however, carefully reconsidered
this feature of the case, and in the light of all the facts we see no
reason at this time for changing our former conclusions.  This
court will retain jurisdiction of the case in the future to the extent
of entertaining applications for a modification of the judgment, and
will, on application and sufficient showing, direct the district court
to make any such changes or modifications in the judgment regard-
ing the custody, support, and education of the children as in the
judgment of this court may be deemed proper and for the best
interests of such minor children.

But one other matter referred to in the petition will be noticed.
At the end of the rehearing petition, and as an alleged newly dis-
covered ground for a rehearing, counsel for plaintiff, in their great
zeal for their client's cause, make the following somewhat remark-
able and unwarranted statements: They charge, in effect, that one
of the members of this court who participated in the decision of the
case was actuated by implied bias in agreeing to the opinion and
decision.  Our attention is directed to exhibit 103, which counsel
characterize as the "free list of the defendant," or, in other words,

a list of those whom defendant has treated gratuitously. Such exhibit is headed, "This list contains accounts uncollectible, accounts for which no charge was intended to be made, and accounts which have been settled by service or merchandise." Then follows the names of nearly one thousand persons, and opposite the names of most of them appear figures indicating charges, opposite the others no such figures appear. The name of 'one judge of this court is included in such list, and opposite his name appears the following: "1—1—7............12." The utmost that can legitimately be argued from this is that, according to defendant's books of account, defendant made a charge of $12 on January 1, 1907, against one who two years later became a member of this court, and from this it is seriously argued that, not only did the relation of physician and patient exist between the doctor and such judge, but that there existed between them such an intimate friendship that the defendant performed, and such judge accepted, such professional service as a gratuity. Such argument is unfair and wholly unwarranted. The exact reverse would appear from the exhibit to be true. There was a charge made which conclusively refutes the inference contended for by counsel. Among other things, counsel say: "If we had had the slightest knowledge or intimation that the defendant in this lawsuit was the physician that had been chosen by any member of this court, and who had treated and performed valuable professional services for such justice, and for which no charge had been rendered or fee paid by such justice, we should have certainly protested to the court against such justice sitting as a member of the court to hear this case." Again they state: "We do not believe under the facts related, that Judge ———, or any other man similarly situated, could possibly sit in this lawsuit without prejudice or bias as between the parties, considering the detailed charges made against the defendant. * * * We insist that we are still entitled to the right which it is plain we have not yet had—that of submitting the issues of this lawsuit to a court composed entirely of judges having no acquaintance with, or reason to be prejudiced in favor of, this defendant. * * * Until this is done, in the opinion of our client and of ourselves, Mrs. Rindlaub will not have had that to which she was honestly entitled in this court, a fair and impartial hearing before fair and impartial judges." The foregoing statements are very broad, and wholly unjustified. While disclaiming any intentional improprieties on the part of such judge, counsel

boldly assert that their client has not been accorded a trial before a court composed of fair and unbiased judges, all because of the trivial claim aforesaid. Such facts would not even constitute statutory grounds for a challenge to a juror in a civil action. The exhibit, as printed in plaintiff's abstract, bears unmistakable evidence that the same was carefully scanned by some one connected with plaintiff's side of the case, as each of the names of the many witnesses for defendant, whose names appear therein, are printed in italics, yet it is asserted that the fact that such judge's name is contained thereon was first discovered at the time of printing this petition for rehearing. We do not mean to question counsel's word in the matter, but it is almost unbelievable, although possible, that such name was overlooked by the person who examined such exhibit for the purpose of underscoring for the printer the names of such witnesses. However this may be, it is preposterous to assert that such judge was in the least prejudiced or biased in defendant's favor on account of the fact disclosed by such exhibit. This contention is as equally devoid of merit as the assertion in the petition to the effect that plaintiff had a right to submit the issues "to a court composed entirey of judges having no acquaintance with" defendant.

The petition is denied.

(125 N. W. 479.)

NOTE—Wife's false charges of husband's infidelity, excited by his conduct, although producing suffering, will not warrant a divorce. McAllister v. McAllister, 9 N. D. 324, 75 N. W. 256. Violent and abusive language by husband to wife producing anger on her part, does not necessarily inflict grievous mental suffering. Mahnken v. Mahnken, 9 N. D. 188, 82 N. W. 870. Infliction of grievous mental suffering, producing no bodily injury, may warrant a divorce. Id. As to divorce for extreme cruelty. De-Roche v. DeRoche, 12 N. D. 17, 94 N. W. 767. Habitual utterance of profane language and obscene stories by wife to husband and others in his presence, where by reason of husband's mental and other characteristics he is caused humiliation and suffering, is cruelty. Mosher v. Mosher, 16 N. D. 269, 113 N. W. 99. So continuous fault finding, threats and other acts intended to aggravate and annoy. Id.